**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

In re:

TURKEY LAKE, LLC, *et al.*,[1]

Debtors.

**Chapter 11**
**Case No. 15-12091 (Main Case)**

Joint Administration Requested

## DECLARATION OF EDWARD NAYLON
## IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND
## FIRST DAY PLEADINGS

I, Edward Naylon, being duly sworn, do state as follows:

1.      I am the President and forty-five (45%) owner of Turkey Lake, LLC  ("Turkey

Lake"), the entity responsible for the management of the operations of affiliated entities: Premier

Laser Spa of Albany, LLC  ("Albany Laser Spa"), Cleveland Laser Spa, LLC ("Cleveland Laser

Spa"), Columbus Laser Spa, LLC ("Columbus Laser Spa"), Lexington Laser Spa, LLC

("Lexington Laser Spa"), Nashville Laser Spa, LLC ("Nashville Laser Spa"), Premier Laser Spa

of Baltimore, LLC ("Baltimore Laser Spa"), Premier Laser Spa of Boston, LLC  ("Burlington

Laser Spa"), Premier Laser Spa of Boston II, LLC  ("Newton Laser Spa"), Premier Laser Spa of

Cincinnati, LLC  ("Cincinnati Laser Spa"), Premier Laser Spa of Greenville, LLC ("Greenville

---

[1] Debtors, along with the last four digits of each Debtor's tax identification number are: Turkey Lake, LLC (3488)
("Turkey Lake"); Premier Laser Spa of Albany, LLC (3453) ("Albany Laser Spa"); Cleveland Laser Spa, LLC
(5481) ("Cleveland Laser Spa"); Columbus Laser Spa, LLC (3998) ("Columbus Laser Spa"); Lexington Laser Spa,
LLC (6290) ("Lexington Laser Spa"); Nashville Laser Spa, LLC (5715) ("Nashville Laser Spa"); Premier Laser Spa
of Baltimore, LLC (6976) ("Baltimore Laser Spa"); Premier Laser Spa of Boston, LLC (4240) ("Burlington Laser
Spa"); Premier Laser Spa of Boston II, LLC (4998) ("Newton Laser Spa"); Premier Laser Spa of Cincinnati, LLC
(7076) ("Cincinnati Laser Spa"); Premier Laser Spa of Greenville, LLC (1316) ("Greenville Laser Spa"); Premier
Laser Spa of Indianapolis, LLC (4868) ("Indianapolis Laser Spa"); Knoxville Laser Spa, LLC (2122) ("Knoxville
Laser Spa"); Premier Laser Spa of Louisville, LLC (6402) ("Louisville Laser Spa"); Premier Laser Spa of
Pittsburgh, LLC (8087) ("Pittsburgh Laser Spa"); Premier Laser Spa of Virginia, LLC (4140) ("Virginia Beach
Laser Spa"); Syracuse Laser Spa, LLC (6793) ("Syracuse Laser Spa"); Premier Laser Spa of Orlando, LLC (1227)
("Orlando Laser Spa"); Premier Laser Spa of St. Louis, LLC (2047) ("St. Louis Laser Spa"); Premier Laser Spa of
Kansas City, LLC (7938) ("Kansas City Laser Spa"); Premier Laser Spa of Richmond, LLC (4482) ("Richmond
Laser Spa"); Premier Laser Spa of Columbia, LLC (3919) ("Columbia Laser Spa").

Laser Spa"), Premier Laser Spa of Indianapolis, LLC ("Indianapolis Laser Spa"); Knoxville

Laser Spa, LLC ("Knoxville Laser Spa"), Premier Laser Spa of Louisville, LLC ("Louisville

Laser Spa"), Premier Laser Spa of Pittsburgh, LLC  ("Pittsburgh Laser Spa"), Premier Laser Spa

of Virginia, LLC  ("Virginia Beach Laser Spa"), Syracuse Laser Spa, LLC ("Syracuse Laser

Spa"), Premier Laser Spa of Orlando, LLC ("Orlando Laser Spa"), Premier Laser Spa of St.

Louis, LLC ("St. Louis Laser Spa"), Premier Laser Spa of Kansas City, LLC ("Kansas City

Laser Spa"), Premier Laser Spa of Richmond, LLC ("Richmond Laser Spa"), and Premier Laser

Spa of Columbia, LLC ("Columbia Laser Spa").

      2.      I am authorized to submit this Declaration in support of Debtors' Chapter 11

petitions and the first day pleadings (the "First Day Pleadings") described herein.

      3.      As President, I have general knowledge and awareness of Debtors' operations.  I

am familiar with Debtors' day-to-day operations, business affairs, facilities, employees and

records.  I have also (i) reviewed and discussed Debtors' strategy in the development and

implementation of a restructuring, (ii) managed professionals engaged by Debtors in connection

with a restructuring, and (iii) consulted with certain key employees with respect to a

restructuring.  As a result, I am familiar with the challenges faced by Debtors' restructuring.

      4.      Debtors intend to conduct their businesses in the ordinary-course and "business as

usual" fashion for the duration of these Chapter 11 cases (the "Chapter 11 Cases").  To minimize

the adverse effects of filing for bankruptcy protection on  Debtors' businesses and employees,

Debtors have requested various types of "first day" relief by motions that are typically heard on

the first day of a Chapter 11 case, as well as motions that are heard subsequently (collectively,

the "First Day Motions").  Each First Day Motion requests authority to allow Debtors to perform

and meet those obligations necessary to fulfill its duties as a debtor-in-possession in their

16941647_1

Chapter 11 Cases by providing relief that will (a) minimize disruption or loss of productivity and value, (b) be critical in achieving a successful restructuring, and (c) support efforts that best serve the interest of Debtors' creditors, customers, employees and stakeholders.

5.      I submit this declaration to describe Debtors' businesses and the circumstances surrounding the filing of their Chapter 11 petitions, together with general information to the Court.  Except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from Debtors' employees or retained advisors, who report to me in the ordinary course of my responsibilities.

6.      I am familiar with the contents of each of the First Day Motions, filed contemporaneously herewith seeking, among other things, to (a) establish procedures for the efficient administration of these cases, (b) continue Debtors' operations in Chapter 11 with as little disruption as possible; and (c) maintain the confidence and support of key constituencies, including employees, vendors and customers.

## BACKGROUND

**A.      Overview of Debtors' Business and History**

7.      Unwanted body hair can be removed by destroying the hair follicle through exposure to laser light pulses.  Debtors perform this service for their customers in fourteen (14) states.  Experienced employees consult with customers and then administer the laser treatments. Depending on the customer's individual characteristics and the size of the hair removal area, it may take up to eighteen (18) months to complete removal of the unwanted body hair from the treatment area, with treatments approximately every six (6) weeks.

8.      Debtors' business model is three-fold.  First, Debtors utilize the newest technology incorporating state-of-the-art lasers in all of their locations.  This includes new cool

3

touch technology, a technology that greatly reduces the historic side effects and discomfort of

hair removal by cooling the skin while heating the hair follicle.  Second, Debtors' technicians are

some of the best in the business, receiving training that far exceeds the industry standard.  Third,

Debtors are committed to an exceptional level of customer service with guaranteed results.

9.      The laser hair removal is highly fragmented with numerous smaller competitors,

including physician practices.  Given the fragmented nature of the laser hair removal industry,

Debtors position as a market-leader in terms of size and geographic footprint provides Debtors

with a unique advantage of scale.

10.     Two months ago, Debtors and their affiliates had twenty-three (23) stores

("Stores") across fourteen (14) states.  Each store is a separate limited liability company

incorporated in the state of its operations.

11.     As of the Petition Date, Debtors employ approximately one hundred (100)

employees.

**B.      Debtors' Formation and Corporate Structure**

12.     With the exception of Turkey Lake, Debtors operate under the "Premier Laser

Spa" brand name.  Turkey Lake participates in the management of each Store.  Turkey Lake

manages human resources, payroll and advertising, and provides oversight to the Stores with

respect to each Store's supplies, equipment, and inventory.

13.     Premier Laser Spas originated from the business relationship of Edward Naylon

and Michael Linehan in August 2012.

14.     Debtors' expansion was explosive, growing to nearly five (5) times its original

size in only three (3) years, with twenty-three (23) stores.

4

16941647_1

15.     Turkey Lake has two members, MPL Funding LLC ("MPL Funding"), a New

York State limited liability company and Mr. Naylon.  Michael Linehan is the sole member of

MPL Funding.  Turkey Lake is the sole and managing member of each other affiliated Debtor.

16.     Debtors have two affiliated entities that, as of the Petition Date, had not

commenced petitions for relief under the Bankruptcy Code.  These include: Premier Laser Spa of

Milwaukee, LLC ("Milwaukee Laser Spa") and Premier Laser Spa of Minneapolis, LLC

("Minneapolis Laser Spa," and together with Milwaukee Laser Spa, the "Non-Debtor

Affiliates").

## C.     Debtors' Assets and Liabilities

### 1.     Assets

17.     Based on the consolidated balance sheet of Debtors and the Non-Debtor

Affiliates, as of December 31, 2014, Debtors had assets of approximately $5,410,899, which

consisted of (i) $4,251,409 in property and equipment, (ii) $150,000 in goodwill, (iii) $897,104

in cash and accounts receivable, and (iv) $112,386 in security deposits.

### 2.     Liabilities

18.     Based on the consolidated balance sheet of Debtors and the Non-Debtor

Affiliates, as of December 31, 2014, Debtors had liabilities in the amount $11,818,511, including

(i) $2,050,520 line of credit, (ii) $1,390,212 accounts payable, (iii) $748,034 credit cards

payable, (iv) $700,070 accrued expenses, (v) $29,333 deferred rent, (vi) $6,434,438 deferred

revenue, (vii) $20,400 note payable, and (viii) $445,504 due to members.

#### a.     Secured Debt

19.     On or about October 30, 2012, Turkey Lake entered into a lending relationship

with Genesee Regional Bank ("GRB"), which provided for a $100,000 line of credit.  On April

5

2, 2013, the availability under the line was increased to $300,000.  On November 7, 2013, the availability was again increased to $1,000,000.  On August 13, 2014, the availability on the line of credit was increased to $2,300,000 (the "GRB Loan").

20.    Turkey Lake used the proceeds from the GRB Loan to fund certain of its operations, as well as the operations of its Debtor affiliates and the Non-Debtor Affiliates.

21.    In connection with the GRB Loan, Turkey Lake executed and delivered a Security Agreement pursuant to which Turkey Lake granted GRB a first position blanket security interest in Turkey Lake's personal property.

22.    Both Mr. Linehan and Mr. Naylon executed personal and unlimited guarantees in connection with the repayment of the GRB Loan.

### b.    Unsecured Debt

23.    As of the Petition Date, Debtors have approximately $2,000,000 in unsecured debt.

### c.    Equity

24.     The equity of each Debtor is owned by Turkey Lake, with the exception of Turkey Lake, whose equity is owned by Ted Naylon and MPL Funding.  As set forth above, Mr. Linehan is the sole member of MPL Funding.

**D.      Events Leading to Debtors' Chapter 11 Filing**

      **1.      The Flaws in the Business Model and Unsuccessful Markets**

25.      While Debtors carefully selected their expansion markets, numerous locations were not successful.  In fact, as of the Petition Date, several Stores have already been merged into more successful Stores resulting in 15 operating Stores at the time of this filing.  The unsuccessful expansions into these markets created a serious financial drain on Debtors.

26.      In addition funding losses at underperforming Stores, Debtors' business has experienced a number of cyclical downturns and appears to be especially sensitive to economic downturns.  In general, economic downturns have a severe negative impact on the overall demand for aesthetic procedures or products, and such decrease in demand results in lower sales, lower margins and, ultimately, lower profitability for Debtors.

27.      In an attempt to remain competitive, Debtors have executed an aggressive and evolving marketing and promotion strategy.  In addition to these discounts reducing Debtors' profitability, Debtors have found that several of the promotions were not successful.  These increased advertising costs further deepened Debtors' precarious financial health.

28.      Debtors also struggled to maintain their workforce.  Highly trained management and technicians are routinely "poached" by competing companies.  To promote retention, Debtors have experienced increased salary costs.

      **2.      American Laser Spa**

29.      ALC Holdings, LLC ("ALC") and its affiliates were among Debtors' main competitors.  ALC and its debtor affiliates provided laser hair removal services with 156 clinics across 27 states.  ALC owned and operated 36 of the clinics, managed 114 of the clinics pursuant to management agreements, and six clinics were licensees of ALC and its debtor affiliates.  On

December 8, 2011, ALC and its affiliates filed voluntary petitions for relief under chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), in the

United States Bankruptcy Court for the District of Delaware.  Upon information and belief,

American Laser Spa's financial troubles have shaken customer confidence in the industry and

have created a depressed market for sales of equipment related to laser hair removal, such as

lasers.

### 3.    Insufficient Internal Controls

30.    It also appears that Debtors failed to match their internal growth with their

external growth.  Debtors provided insufficient training, resulting in inconsistent management

across the Stores.

31.    In this industry, customers often request additional services or additional areas.  In

those cases, Employees would negotiate the price of those services, in part, based upon the

amount owing from the customer's current treatment.  The inconsistencies in reporting these

arrangements have resulted in the failure to correctly report the profit or loss of locations.  Since

the proceeds of the arrangement is received up front and treatments can take up to 18 months to

provided there appears to be profit available due to cash accumulation.  This distorts the

profitability of Debtors.  This method of recording revenues is not in accordance to general

accepted accounting principles.

32.    The lack of uniform training and execution resulted in inflated projections and

reporting.

### 4.    Litigation

33.    Debtors' financial situation was also significantly impacted by professional fees

incurred as a result of unexpected and contentious litigation, including unfair competition

litigation, and a handful of employee complaints filed with the Equal Employment Opportunity Commission.

### 5.      GRB and Vendor Relationships

34.      Lastly, and most significantly, GRB froze Turkey Lake's operating account forcing an emergency filing.

## E.      Chapter 11 Cases

35.      As a result of all of the foregoing, Debtors have insufficient capital to continue to fund unprofitable locations.  Their plan is to "right size" Debtors by downsizing and focusing on the core successful Stores and core laser hair removal business.  To that end, Debtors, in the exercise of their reasonable business judgment, have ultimately determined that seeking bankruptcy protection to effectively restructure their assets and liabilities is the most effective way to maximize the value of their estates for the benefit of their constituents.

36.      Debtors' customers typically purchase a set of treatment sessions at a time, and their referrals generate a large part of new customer relationships.  Debtors' business is a customer service business, and customer confidence is crucial for its viability.  As such, a lengthy Chapter 11 proceeding would erode customer confidence and be detrimental to Debtors' business.

37.      In Chapter 11, Debtors have an opportunity to effectuate their strategy to avoid further deterioration of their business.  Debtors believe that Chapter 11 protection will allow Debtors to continue as a strong competitor in their industry, with a balance sheet and capital structure that allows them to focus on improving their marketing process and customer satisfaction.  In order to maintain Debtors' enterprise value, additional financing and use of cash

9

collateral are required to fund Debtors' business in the ordinary course, including the funding of

payroll, additional materials purchases, other general expenses and funding interest.

38.      In order to effectuate strategies to maximize value for all constituents, including

unsecured creditors, Debtors were forced to commence these cases now and respectfully seek the

relief set forth in the First Day Motions summarized below.  Concurrently with filing the

voluntary petitions to commence these cases, Debtors will be filing a number of First Day

Motions.  Debtors anticipate that the Court will conduct a hearing within one or two business

days after the commencement of these cases (the "First Day Hearing"), during which the Court

will entertain the argument of counsel with respect to the relief sought in each of the First Day

Motions.  Capitalized terms used and not otherwise defined herein shall have the meanings

ascribed to such terms in the respective First Day Motions.

39.      I have reviewed each of the First Day Motions, including the exhibits thereto, and

believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the

goals described above and will, ultimately, be critical to Debtors' ability to achieve success in

these cases.  Moreover, I have carefully reviewed each of the factual statements in the First Day

Motions and believe each such factual statement to be accurate.  While certain statements in the

First Day Motions are summarized or repeated herein, all of the facts set forth in the First Day

Motions are incorporated by reference.

40.      The First Day Motions are identified, listed and more fully described below:

## FIRST DAY MOTIONS

**A.      Motion of Debtors for an Order Directing Joint Administration of Related Chapter
11 Cases**

41.      Debtors believe that many of the motions, applications, hearings, and Orders that

will arise in these Chapter 11 Cases will jointly affect each and every Debtor.  Under these

circumstances, Debtors believe that the interests of Debtors, their estates, their creditors, and other parties-in-interest would be best served by the joint administration of these Chapter 11 Cases, which will ease the administrative burden on the Court and all parties-in-interest.

42.     Further, the joint administration of Debtors' Chapter 11 Cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of Debtors' respective estates and other parties in interest.  Joint administration will permit counsel for all parties-in-interest to include Debtors' respective cases in a single caption on the numerous documents that will be filed and served in these Chapter 11 Cases.  Joint administration also will enable parties-in-interest in each of the above-captioned Chapter 11 cases to be apprised of the various matters before the Court in all cases.

43.     The entry of an Order granting joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of the Court, render the completion of various administrative tasks less costly, and minimize the number of unnecessary delays.  Moreover, the relief requested by this Motion will simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee for the Northern District of New York.

44.     For the foregoing reasons, Debtors submit, and I believe, that the relief requested in the motion for joint administration is in the best interests of Debtors, their estates, and their creditors, and therefore should be approved.

**B.      Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for (i) Authorization to Pay Wages, Compensation, and Employee Benefits and (ii) Authorization for Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations**

11

45.     In order to enable Debtors to retain their Employees and maintain morale during this critical time, and minimize the personal hardship such Employees may suffer if prepetition employee-related obligations are not paid when due or honored as expected, Debtors, by this Motion (the "Employee Compensation Motion"), seek authority, in their discretion, to pay and honor, as the case may be, all prepetition amounts owing, and to continue paying in the ordinary course amounts incurred postpetition, on account of: (a) Wages and Salaries, Bonuses, PTO, and certain costs and disbursements related to the foregoing, up to the statutory cap per employee (b) Payroll Taxes, (c) any claims or payments pursuant to the Employee Benefit Plans, including the medical, dental, 401(k), life and disability insurance plans, workers' compensation coverage, and Reimbursable Expenses, and (d) all prepetition federal and state Withholding Obligations and Garnishments (collectively, the "Employee Obligations").  Debtors further request that the Court enter an order directing all banks to honor Debtors' prepetition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.  The Employees are essential to the continued operation of Debtors' business, and the Employees' morale directly affects their effectiveness and productivity.

46.     The Employees perform a variety of critical functions for Debtors, including, without limitation, performing laser hair removal treatments, managing store operations, finance, human resources, customer service, marketing, sales, and other tasks.  The Employees' skills and their knowledge and understanding of Debtors' operations, customer relations, and infrastructure are essential to Debtors' reorganization efforts.

47.     Moreover, many of the Employees rely exclusively on the compensation and benefits that they receive from Debtors to provide for their daily living expenses and these

12

Employee would be exposed to significant financial difficulties if Debtors are not permitted to continue paying and providing such compensation and benefits in the ordinary course of their businesses.

48.     Consequently, I submit that it is critical that Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date.  If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid postpetition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses.  A loss of employee morale and goodwill at this juncture would undermine Debtors' stability, and undoubtedly would have an adverse effect on Debtors, their customers, the value of their assets and business, and their ability to achieve their objectives in Chapter 11.  For the foregoing reasons, Debtors believe, and I submit, that the relief requested in the Employee Compensation Motion is in the best interests of Debtors, their estates, and their creditors, and therefore should be approved.

**1.      Background Relating to Employees**

49.     Debtors have a total of approximately 147 employees (the "Employees").  Out of the total 147 employees, approximately 114 are full-time employees and 33 are part-time employees.

50.     Debtors' monthly payroll averages approximately $550,000 in the aggregate including the portion of the Payroll Taxes (as defined below).

51.     Turkey Lake pays all employee wages and salaries on behalf of Debtors ("Wages and Salaries").  Employees are paid on a bi-weekly basis, 7 days in arrears.

13

52.     Thus, payroll is normally made on about every two (2) weeks (every other Friday).  Debtors' last regular payroll date for these Employees was October 16, 2015 for the period ending October 9, 2015.

53.     Debtors estimate that, as of the Petition Date, approximately $138,000 in Wages and Salaries has accrued and is owed to these Employees.  This amount includes bonuses, as certain Employees are also eligible to receive bonuses for monthly sales and incremental sales. Debtors have separate bonus programs for technicians based on monthly incremental sales, assistant managers and clinic managers based on monthly clinic sales, call center employees based on certain performance standards, and regional managers based on monthly regional clinic sales ("Bonuses").  To the best of Debtors' knowledge, no Employee is owed in excess of the statutory cap for Wages and Salaries and Bonuses as of the Petition Date.

54.     Paychex Business Solutions ("Paychex") processes payroll for Debtors.  As of the Petition Date, Debtors are current on amounts due to Paychex and believe that the amount of outstanding prepetition obligations to Paychex, if any, are *de minimis*.

55.     By the Employee Compensation Motion, Debtors request the authority to pay all unpaid Wages and Salaries and Bonuses to their Employees, in the ordinary course of business.

56.     Debtors, as employers, are also required by law to withhold federal, state and local taxes from Wages and Salaries for remittance to appropriate tax authorities (the "Employee Taxes").  In addition, Debtors are required to pay, from their own funds, the social security and Medicare taxes and pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, the "Payroll Taxes") and remit the same to the appropriate authorities (collectively, the "Taxing Authorities").  For permanent Employees, Debtors pay Payroll Taxes

14

to various Taxing Authorities in accordance with the Internal Revenue Code and applicable state law.

57.     Debtors' average two-week total obligation for Payroll Taxes is approximately $11,000.  Debtors seek authority to honor and process the prepetition obligations with respect to the Payroll Taxes.

### 2.     Vacation Time and Sick/Personal Days

58.     Unless otherwise provided for in an Employment Agreement, all full-time. Employees receive paid time off ("PTO"), including holiday (6 days), vacation (1 week), and sick/personal day pay (3 days).  All vacation days must be used during the year in which it accrues, except where prohibited by law.  With the exception of accrued vacation time, Debtors generally do not allow Employees to "cash out" any accrued PTO, except when mandated under applicable state law or pursuant to the terms of a collective bargaining agreement.  Debtors' policy with respect to accrued vacation time provides for payout unless the employee is terminated for cause.  By this Motion, Debtors request authority to continue to honor their paid time off policies in the ordinary course of business and to honor all prepetition obligations related thereto.

59.     Debtors do not at this time request authorization to pay for unused paid time off upon termination but rather to honor accrued unused paid time off in the postpetition period.

### 3.     Employee Benefit Plans

60.     In the ordinary course of business, and as is customary for companies of their Debtors maintain various employee benefits and policies that provide their Employees with medical, dental, 401(k), life and disability insurance (collectively, the "Employee Benefit Plans").

15

59.     The Employee Benefit Plans are either fully funded by the Employees, and others

are funded either partially or fully through contributions made by Debtors.  Debtors request

authority to pay prepetition amounts due under the Employee Benefit Plans in a total amount not

to exceed $10,000.

### 4.     Reimbursable Expenses

60.     Debtors have a formal policy whereby their Employees seek reimbursement of

business-related expenses.  Debtors reimburse Employees weekly for certain ordinary course

expenses incurred within the scope of the Employees' employment, including travel, lodging,

transportation, meals, cell phone bills, fax charges and other miscellaneous expenses

(collectively, the "Reimbursable Expenses").

61.     However, a majority of the employee expenses related to the Employees are paid

monthly.  All reimbursement requests must be submitted to the Employee's supervisor for

approval by means of an expense report along with the receipts.

62.     Debtors' monthly average Reimbursable Expenses are approximately $8,500 and

are paid by check.  As of the Petition Date, Debtors estimate that approximately $4,500 in

Reimbursable Expenses have been incurred but remain unpaid.  By this Motion, Debtors seek

authority to continue their prepetition practices with respect to the Reimbursable Expenses and to

pay all prepetition amounts outstanding in connection therewith.

### 5.     Prepetition Withholding Obligations

63.     As part of the relief requested herein, Debtors also seek authorization to pay all

Employee federal and state withholding and payroll-related taxes relating to prepetition periods,

including, but not limited to, all withholding taxes, Social Security taxes, unemployment taxes,

Medicare taxes, and garnishments, as well as all other withholdings such as contributions to

16941647_1

savings, retirement or pension plans, insurance contributions, and charitable contributions, if any (collectively, the "Withholding Obligations").  As of the Petition Date, Debtors estimate that the amount of accrued and outstanding Withholding Obligations was approximately $11,000.

64.     Debtors routinely withhold from Employee paychecks the Withholding Obligations, and are required to transmit these amounts to third-parties. Debtors believe that such withheld funds, to the extent that they remain in Debtors' possession, constitute moneys held in trust and therefore, are not property of Debtors' bankruptcy estates.  Thus, whether or not such funds are prepetition amounts, Debtors believe that directing such funds to the appropriate parties does not require Court approval.  Nevertheless, out of an abundance of caution, Debtors are seeking Court authority to pay any outstanding amounts owed by Debtors for Withholding Obligations, in the ordinary course of business, including those incurred prior to the Petition Date.  In addition, Debtors withhold and reimburse amounts to appropriate governmental agencies for garnishments ordered in connection with bankruptcy, child support, tax and other judgments (the "Garnishments").

**C.     Motion for Order Authorizing Maintenance of Prepetition Cash Management System, Continued Use of Existing Business Forms, and Granting Related Relief**

65.     By this motion (the "Cash Management Motion"), Debtors, among other things, request the right, in their discretion, to continue to use their existing cash management system and to continue utilizing existing business forms and checks.  I believe that the Cash Management System mechanisms are well-suited to Debtors' business needs and operations.

66.     Prior to the commencement of these Chapter 11 Cases, and in the ordinary course of their businesses, Turkey Lake maintained one operating account and one investment account at GRB.  Every receivable related to the business of Debtors and the Non-Debtor Affiliates was deposited into the GRB operating account.  To lessen the disruption caused by bankruptcy filings

and maximize the value of their estates in these Chapter 11 Cases, it is vital to Debtors that they retain their Cash Management System.

67.    In anticipation of the Petition Date, Turkey Lake opened an account at KeyBank, N.A.  ("KeyBank DIP Account").  In their First Day Motion, Debtors seek to use the KeyBank DIP Account in the same manner as they used the prepetition GRB operating account, with the exception of the Non-Debtor Affiliates' use of that account.  The Non-Debtor Affiliates have ceased operations.  Debtors seek to have all receivables deposited in the KeyBank DIP Account, as well as all disbursements made from the same account.

68.    Debtors' current Cash Management System has been in place for approximately two years.  Credit card and patient financed sales, net of applicable merchant and financing fees were deposited directly into the GRB operating account and will now be deposited into the DIP KeyBank Account.  Cash and checks were also deposited into directly into the GRB operating account and will now be deposited into the DIP KeyBank account.

69.    Debtors maintain records of all deposits and disbursements, and thus can ascertain, trace and account for intercompany transactions. Debtors will continue to maintain records postpetition.

70.    In the ordinary course of business, Debtors use blank check stock with the relevant Debtor's logo printed thereon.  System generated sequenced check numbers are printed on stock as checks are printed.  In addition, Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials, standard procedure forms for clients, product information forms for clients, photography release forms for clients, internal administrative forms, internal medical procedures and guidelines, and other business forms (collectively, along with Debtors' checks, the "Business Forms").  To

minimize administrative expense and delay, Debtors request authority to continue to use their

Business Forms substantially in the forms existing immediately prior to the Petition Date,

without reference to Debtors' "Debtor-in-Possession" status.  For the foregoing reasons, Debtors

believe, and I submit, that the relief requested in the Cash Management Motion is in the best

interests of Debtors, their estates, and their creditors, and therefore should be approved.

**D.      Motion of Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (i) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (ii) Deeming Utility Providers Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment**

71.      By this motion (the "<u>Utilities Motion</u>"), Debtors seek entry of an Order (i)

prohibiting Debtors' Utility Providers from altering, refusing, or discontinuing service, (ii)

deeming Utility Providers adequately assured of future performance, and (iii) establishing

procedures for determining adequate assurance of payment pursuant to Sections 105 and 366 of

the Bankruptcy Code.  Although Debtors seek the continued provision of utility services from

the Utility Providers, Debtors are not seeking authority or direction to pay any specific claim.

72.      Uninterrupted utility services are essential to the preservation of Debtors' estates

and assets, and therefore, to the success of these cases.  For this reason, Debtors believe, and I

submit, that the relief requested in the Utilities Motion is in the best interests of Debtors, their

estates, and their creditors, and therefore should be approved.

**E.      Motion of Debtors for Entry of an Order (a) Authorizing Debtors to Pay Prepetition Sales and Use Taxes and Regulatory Fees in the Ordinary Course of Business pursuant to sections 105(a), 363, 507(a), and 541(d) of the Bankruptcy Code, to pay, in Debtors' sole discretion, prepetition Taxes and Fees owed to the Taxing and Regulatory Authorities, including, without limitation, Taxes and Fees subsequently determined to be owed for periods prior to the Petition Date of up to $50,000**

73.      By this Motion (the "<u>Taxes and Fees Motion</u>"), Debtors seek entry of an Order

authorizing, but not directing, Debtors to pay, in the ordinary course of their business, prepetition

19

sales, gross receipts, utility users, federal excise and use, and certain other governmental taxes,

including any amounts subsequently determined to be owing upon audit (collectively, the

"Taxes"), regulatory fees, including, without limitation, federal, state, and local regulatory fees

(the "Regulatory Fees"), and permit or other licensing fees (the "Licensing Fees," and together

with the Taxes and Regulatory Fees, the "Taxes and Fees") to the respective federal, state, and

local taxing authorities and other governmental agencies (each a "Taxing Authority," and

collectively, the "Taxing Authorities").

74.     I submit that authorizing Debtors to pay, in their discretion, the prepetition Taxes

and Fees will help Debtors avoid serious disruption to their operations that would result from the

nonpayment of such Taxes and Fees, including the distraction and adverse effect on morale that

could result from liability for nonpayment imposed upon Debtors' directors and officers.

Furthermore, nonpayment of these obligations may cause Taxing Authorities to take precipitous

action, including, but not limited to, filing liens, preventing Debtors from conducting business in

applicable jurisdictions, and seeking to lift the automatic stay, all of which could disrupt

Debtors' day-to-day operations, impose significant costs on Debtors' estates, and destroy the

going-concern value of Debtors' business.

75.     In connection with the normal operation of their businesses, Debtors pay an

assortment of Taxes and Fees to the Taxing Authorities.

76.     In the normal course of their business, Debtors incur sales taxes (the "Sales

Taxes") upon the sale of their services and products.  Debtors collect and remit or otherwise pay

Sales Taxes as needed to the applicable Taxing Authorities.  In addition to the Sales Taxes owed

but not yet paid as of the Petition Date, the Sales Taxes may also include amounts paid by checks

sent prior to the Petition Date that have not cleared Debtors' bank accounts on the Petition Date.

77.     In addition, in the normal course of their businesses, Debtors incur use taxes (the "Use Taxes") on account of the purchase of various inventory, supplies or other goods used in Debtors' businesses.  The Use Taxes typically arise pursuant to purchases Debtors make from out-of-state vendors that do not collect state sales tax on such out-of-state purchases.

78.     The Use Taxes are typically equivalent to the amount of sales tax that would have been charged on the purchase of such goods if the purchase had occurred within the state where the vendor is located.  In the aggregate, Debtors estimate that they owe approximately $200 in outstanding Sales Taxes and Use Taxes as of the Petition Date.

79.     For the foregoing reasons, Debtors believe, and I submit, that the relief requested in the Taxes and Fees Motion is in the best interests of Debtors, their estates, and their creditors, and therefore should be approved.

**F.     Motion of Debtors for Entry of an Order Authorizing Debtors to Maintain Existing Insurance Policies, Pay All Policy Premiums and Brokers' Fees Arising Thereunder, and Renew or Enter Into New Policies, and Pay Insurance Premium Financing Obligations Arising in Connection Therewith and Renew**

80.     By  this motion (the "Insurance Motion"), Debtors seek to maintain existing insurance policies, pay all policy premiums and brokers' fees arising thereunder, whether prepetition or postpetition, and renew or enter into new policies as needed.

81.     In the ordinary course of Debtors' businesses, Debtors maintain numerous insurance policies providing coverage for, *inter alia*, commercial general liability, umbrella liability, workers' compensation, medical professional liability,, property, employment practices, and crime (collectively, the "Policies").  These Policies are essential to the preservation of Debtors' businesses, properties, and assets, and, in many cases, such insurance coverage is required by various regulations, laws, and contracts that govern Debtors' business conduct.

82.     The Policies are essential to Debtors' businesses, and I believe it is in the best

interests of Debtors' estates to permit Debtors to honor their obligations under their current

insurance contracts (including related brokers' fees).  Any other alternative would likely require

considerable additional cash expenditures and would be detrimental to Debtors' efforts to

preserve and maximize the value of their estates.  For the foregoing reasons, Debtors believe, and

I submit, that the relief requested in the Insurance Motion is in the best interests of Debtors, their

estates, and their creditors, and therefore should be approved.

**G.     Motion of Debtors for Entry of an Order Authorizing Debtors to Honor Certain
Prepetition Obligations to Customers and to Otherwise Continue Certain Customer
Practices and Programs in the Ordinary Course of Business**

83.     By this Motion (the "Customer Programs Motion") Debtors seek entry of an

Order, pursuant to sections 363, 507, 1107(a) and 1108 of the Bankruptcy Code, authorizing, but

not directing, Debtors, in their sole discretion, to honor outstanding pre-petition obligations

owing to their customers under Debtors' Customer Programs, and to continue offering and

honoring the Customer Programs including Debtors' guarantee programs.

84.     The first customer program offered by Debtors provides customers with a

guarantee that laser hair removal treatments will remove unwanted hair from the treatment areas,

but does not provide a lifetime guarantee for the removal of the unwanted hair (the "Non-

Lifetime Guarantee Program.")

85.     The second customer program offered by Debtors provides customers with both a

guarantee that laser hair removal treatments will remove unwanted hair from the treatment areas

and a lifetime guarantee for the removal of the unwanted hair (the "Lifetime Guarantee

Program," and together with the Non-Lifetime Guarantee Program the "Customer Programs").

86.     I submit that the success and viability of Debtors' businesses and Debtors' ability to successfully maximize the value of their estates is in large part dependent upon the patronage and loyalty of their customers.  The Customer Programs are fundamental to the continued success of Debtors' businesses because, by design, the Customer Programs encourage repeat business, ensure customer satisfaction, and encourage referrals to new customers, thereby enabling Debtors to retain current customers, attract new customers, and ultimately maintain and increase revenue.

87.     Maintaining the Customer Programs is critical to the continuation of customer loyalty and satisfaction, and failure to continue these programs would severely and irreparably impair Debtors' customer relations.

88.      If Debtors were unable to offer the Customer Programs, they would be at a significant disadvantage compared to their competitors.  Therefore, the ability to continue to provide the Customer Programs is vital to Debtors' ongoing relationship with their current and future customers and their ability to emerge from Chapter 11 protection with a strong market share and customer base.  For the foregoing reasons, Debtors believe, and I submit, that the relief requested in the Customer Programs Motion is in the best interests of Debtors, their estates, and their creditors, and therefore should be approved.

**H.     Motion Pursuant to Sections 102(1) and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002(m) and 9007 for Entry of An Order Approving Case Management Procedures**

89.     By this motion (the "Case Management Motion"), which will be forthcoming, Debtors will seek entry of an Order limiting notice procedures in these Chapter 11 Cases.

90.     Debtors believe that these Chapter 11 Cases may involve hundreds or thousands of parties-in-interest.  As a result, Debtors anticipate that numerous parties may file requests for

23

service of filing pursuant to Bankruptcy Rule 2002, and that numerous motions, applications, and other pleadings may be filed in these Chapter 11 Cases.

91.      Under these circumstances, Debtors believe that the interests of Debtors, their estates, their creditors, and other parties-in-interest would be best served by limiting notice procedures as set forth in the Case Management Motion, which will ease the administrative burden on the Court and all parties in interest.

92.      For the foregoing reasons, Debtors believe, and I submit, that the relief requested in the Case Management Motion is in the best interests of Debtors, their estates, and their creditors, and therefore should be approved.

**I.      Debtors Application for Entry of an Order Authorizing the Employment and Retention of LeClairRyan, A Professional Corporation, as Counsel to Debtors *Nunc Pro Tunc* to the Petition Date**

93.      By this application (the " LeClairRyan Retention Application"), Debtors respectfully request the Court approve the employment and retention of LeClairRyan, A Professional Corporation *nunc pro tunc* to the Petition Date, pursuant to Sections 327(a), 328(a), and 330 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1.

94.      As more fully described in the LeClairRyan Retention Application, LeClairRyan has informed Debtors that Maureen T. Bass, as well as other shareholders, associates and paraprofessionals who will be involved in these cases, are members in good standing of various state and federal bars.  Debtors have selected LeClairRyan as their counsel because of the firm's knowledge of Debtors' businesses and financial affairs, its extensive experience in, among other areas, bankruptcy reorganizations and debtors' and creditors' rights, and its extensive experience in numerous other chapter 11 cases before this Court and other courts nationwide.

95.     In assisting with the preparation of Debtors' cases, LeClairRyan has become intimately familiar with Debtors' business affairs and capital structure, and will be able to immediately assist Debtors in their efforts in these cases.  LeClairRyan has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of these cases. Thus, in order to maximize the value of Debtors' estates and because of LeClairRyan's recognized expertise in bankruptcy law, I desire that LeClairRyan represent Debtors in these cases.  Debtors believe, and I submit, that Debtors' employment of LeClairRyan is appropriate and necessary to enable Debtors to execute faithfully their duties as debtors and to implement a successful reorganization.

**J.     Motion for an Order (i) Authorizing Debtors to Use Cash Collateral, (ii) Fixing Adequate Protection, and (iii) Scheduling Final Hearing**

96.     By this motion (the "Cash Collateral Motion"), Debtors seek entry of an Order, among other things, (i) authorizing Debtors to use cash collateral and (ii) fixing adequate protection.

97.     As set forth above, Debtor Turkey Lake is currently indebted to GRB under the terms and conditions of the GRB Loan.  GRB is the sole secured creditor of any Debtor. Pursuant to its loan documents, GRB asserts a security interest in, among other things, Turkey Lake's equipment and inventory.  Upon information and belief, GRB attempted to perfect its purported security interest by filing a UCC-1 financing statement with the New York State Department of State.

98.     Debtors dispute whether GRB holds any valid security interest on cash collateral and submit that the grant of a potential rollover replacement lien is sufficient to adequately protect any claim that GRB may hold against Debtors' estates.

## **CONCLUSION**

99.    The viability of Debtors' businesses and the continuation of Debtors' operations not only affect the interests of their creditors and economic stakeholders, but also numerous employees, and a vast group of customers across the country.  Through the First Day Motions described above, Debtors seek to minimize certain adverse effects that these cases might otherwise have on their business, while Debtors consummate an expeditious reorganization. .

100.    To preserve the value of their business to the fullest extent possible, Debtors' immediate objective is to maintain "business as usual" following the commencement of these Chapter 11 Cases by minimizing the adverse impact of the filing on Debtors' assets and operations.  For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of Debtors' creditors and other stakeholders will be substantially dependent on this Court's grant of the relief sought in each of the First Day Motions and respectfully request the Court to do so.

101.    Given that this Declaration is being filed with the Court on an expedited basis due to Debtors' current circumstances, I reserve the right to supplement this Declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 19, 2015.

EDWARD NAYLON

16941647_1